IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**Jennifer Montoya and**
**Joe C. Montoya,**

**Plaintiffs,**

v.                                                                          No. 2:16-cv-00386-MCA-SMV

**New Mexico Institute of Mining and**
**Technology Board of Regents;**
**and Leonard Garcia,**

**Defendants.**

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on *Defendants' Motion to Dismiss* filed May 20, 2016. [Doc. 6] The Court has considered the parties' submissions, the record, and the relevant law. The *Motion* is well taken and shall be granted as to Plaintiffs' federal claims, with the remaining state claims remanded to the state court.

## BACKGROUND

The following background information is derived from the factual allegations in Plaintiffs' *First Amended Complaint for Damages Under New Mexico Law and Title IX of the Education Amendments of 1972* (the *Complaint*). [Doc. 1-1]

Plaintiff Jennifer Montoya is employed by the New Mexico Institute of Mining and Technology (the Institute) in Socorro, New Mexico. [Doc. 1-1 p. 1] Plaintiff Joe C. Montoya is Jennifer Montoya's husband. [Doc. 1-1 ¶ 1] Defendant Leonard Garcia is employed by the Institute. [Doc. 1-1 ¶ 3] The Institute's Board of Regents, a named

1

Defendant in this case, constitutes "a body corporate" through which the institute may sue or be sued. [Doc. 1-1 ¶ 2] *See* NMSA 1978, § 21-11-4 (1953) (vesting the operations of the Institute in a board of five regents). The Institute receives federal financial assistance. [Doc. 1-1 ¶ 5]

    Ms. Montoya and Mr. Garcia worked together at the Institute's Energetic Materials Research and Testing Center (EMRTC) from April 2011, when Ms. Montoya was hired by the Institute, until November 2013, when Mr. Garcia took a position in the Institute's Petroleum Recovery and Research Center (PRRC). [Doc. 1-1 ¶¶ 27-28] On March 10, 2014 Mr. Garcia gave Ms. Montoya his CPR card so that Ms. Montoya could laminate it. [Doc. 1-1 ¶ 30] On March 19, 2014, Ms. Montoya, Mr. Garcia, and others had lunch together at a restaurant whereupon Ms. Montoya could give the laminated CPR card to Mr. Garcia. [Doc. 1-1 ¶ 32] When they returned to campus after lunch, Ms. Montoya accepted Mr. Garcia's invitation to go inside PRRC building so that she could see could see his new office. [Doc. 1-1 ¶ 33]

    From the hallway, Ms. Montoya peeked into Mr. Garcia's office. [Doc. 1-1 ¶ 36] Mr. Garcia, who was standing behind Ms. Montoya, pushed her into the office, entered behind her, and closed the door. [Doc. 1-1 ¶ 37] Mr. Garcia then repeatedly and forcibly fondled Ms. Montoya, made repeated sexual and degrading advances and comments, and removed articles of his own clothing. [Doc. 1-1 ¶ 38] Ms. Montoya did not consent to these acts, and she repeatedly told Mr. Garcia that she wanted to leave his office, said "no," and told him to "stop." [Doc. 1-1 ¶ 38] After several attempts to leave the office were unsuccessful because Mr. Garcia pushed her away from the door, physically

blocked her path, and cornered her, Ms. Montoya eventually escaped. [Doc. 1-1 ¶¶ 39-40]

Minutes later, Ms. Montoya phoned EMRTC Assistant Facility Security Officer David Urban to inform him that Mr. Garcia had sexually attacked her in his office in the PRRC building. [Doc. 1-1 ¶ 41] By the time she called Mr. Urban, Ms. Montoya had been on campus after lunch for approximately fifteen minutes. [Doc. 1-1 ¶¶ 33, 41] Mr. Urban advised Ms. Montoya that he would be on campus the following day (March 20th), and that they could meet in person. [Doc. 1-1 ¶ 42] When they met, Mr. Urban advised Ms. Montoya to report the incident to Mona Torres, Director of Finance and Human Resources for EMRTC, and she did so that day. [Doc. 1-1 ¶ 45] Ms. Torres advised Ms. Montoya to seek counseling, to take FMLA leave, and to report the attack to Jo Ann Salome, Director of Human Resources for the Institute. [Doc. 1-1 ¶ 48] Ms. Salome and Ms. Torres both possessed authority to take disciplinary action against Mr. Garcia. [Doc. 1-1 ¶¶ 47, 52]

Mr. Urban reported the matter to the Institute's Assistant Police Chief, Scott Scarborough. [Doc. 1-1 ¶ 45] The next day (March 21) Mr. Scarborough interviewed Ms. Montoya regarding the "sexual attack." [Doc. 1-1 ¶ 49] During this interview, Ms. Montoya asked Mr. Scarborough to help her get a restraining order against Mr. Garcia. [Doc. 1-1 ¶ 49] For reasons that are not given, Ms. Montoya "never received a protective order of any form against [Mr.] Garcia." [Doc. 1-1 ¶ 54]

Ms. Montoya took leave from her job from March 24, 2014 to April 1, 2014 pursuant to a directive from "treating health care personnel." [Doc. 1-1 ¶ 50] Four days

3

into her leave period, Ms. Montoya met with Ms. Salome (the human resources director). [Doc. 1-1 ¶ 51] Five days earlier (on March 23rd) Mr. Garcia had tried twice to contact Ms. Montoya by telephone, and Ms. Montoya told Ms. Salome about the attempted telephone contact. [Doc. 1-1 ¶ 51] Ms. Salome told Ms. Montoya that Mr. Garcia had already been placed on leave by that time, as a disciplinary action, so that it was "impossible" for him to have contacted Ms. Montoya. [Doc. 1-1 ¶¶ 51, 55] Ms. Salome also advised Ms. Montoya that "'it would be best for [Ms. Montoya] to put [the assault] behind her.'" [Doc. 1-1 ¶ 51] And she advised Ms. Montoya that "to be fair" Mr. Garcia would be permitted to return to work on April 1st—the same day that Ms. Montoya planned to return. [Doc. 1-1 ¶ 51] Ms. Montoya contacted Ms. Salome again on March 31st, one day before she returned to work "to inquire regarding a protective order against [Mr.] Garcia." [Doc. 1-1 ¶ 53] In response to that inquiry, Ms. Salome advised Ms. Montoya that she had told Mr. Garcia "not to go near" her. [Doc. 1-1 ¶ 53]

    Mr. Garcia was not subjected to further discipline beyond the approximate week-long leave period and Ms. Salome's admonishment to him not to go near Ms. Montoya. [Doc. 1-1 ¶ 55] "[Mr.] Garcia retained his position with full access to his PRRC office and campus facilities from the end of his . . . leave to the present—leaving open the potential for interactions between [him and Ms.] Montoya[.]" [Doc. 1-1 ¶ 56] Ms. Montoya suffered mental health injuries that have required her to incur the expense of ongoing mental health care, and to take a job reassignment. [Doc. 1-1 ¶¶ 57-58] She has also used sick leave, annual leave, and she has taken unpaid leave for time off work. [Doc. 1-1 ¶ 57]

Based on the foregoing, Ms. Montoya filed the present lawsuit. The *Complaint* includes the following claims: Count 1, a false imprisonment claim against Mr. Garcia; Count II, an assault claim against Mr. Garcia; Count III, a battery claim against Mr. Garcia; Count IV, a claim against Mr. Garcia for intentional infliction of emotional distress; Count V, a claim by Mr. Montoya against Mr. Garcia for loss of consortium; Count VI, a claim against the Institute of a violation of Title IX for its "clearly unreasonable response" to the attack perpetrated by Mr. Garcia; and Count VII, a claim against the Institute of a "hostile work environment" based on its allegedly inadequate response to the attack. [Doc. 1-1 p. 10-18]

Defendants seek dismissal of the *Complaint* pursuant to Fed. R. Civ. P. 12(b)(6) on the ground that the *Complaint* fails to state a claim upon which relief can be granted. [Doc. 6]

The Court concludes that Plaintiffs' claims under Title IX are not plausible. Plaintiffs' remaining claims, which are brought pursuant to state law, shall be remanded to the Seventh Judicial District Court, Socorro County, New Mexico.

**STANDARD OF REVIEW**

In determining whether the *Complaint* can survive Defendants' *Motion to Dismiss* the Court considers whether Plaintiffs have stated "a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The court accepts, as true, factual allegations in a complaint, but "[t]hreadbare recitals of the elements of a cause of

5

action, supported by mere conclusory statements, do not suffice." *Id.* Additionally, in determining whether a complaint states a plausible claim for relief a court may draw "on its judicial experience and common sense"; "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (alteration omitted).

**ANALYSIS**

**Overview of Title IX Liability**

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a). "Title IX is . . . enforceable through an implied private right of action," and "monetary damages are available in the implied private action." *Gebser v. Largo Vista Indep. Sch. Dist.*, 524 U.S. 274, 281 (1998). Title IX may be enforced only against the recipient of federal funds and the funding recipient may only be liable in damages under Title IX for its own misconduct. *Davis ex rel. Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 640 (1999). Thus, in order to be held liable under Title IX, the funding recipient *itself* must have, on the basis of sex, acted to exclude a person's participation in, deny a person the benefits of, or subject a person to discrimination under an education program or activity that receives federal financial assistance. *Davis*, 526 U.S. at 640-41. Title IX does not allow a plaintiff to

recover damages under a theory of vicarious liability. *Davis*, 526 U.S. at 661 (Kennedy, J. Dissenting).

To state a claim under Title IX, a plaintiff must demonstrate that the school "(1) has actual knowledge of, and (2) is deliberately indifferent to, (3) harassment that is so severe, pervasive and objectively offensive as to . . . deprive access to the . . . opportunities provided by the school." *Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1119 (10th Cir. 2008); *Escue v. N. Okla. Coll.*, 450 F.3d 1146, 1152 (10th Cir. 2006). In that regard, the substantive standards that govern Title VII sex discrimination apply, as well, to Title IX claims. *See Davis*, 526 U.S. at 651 (adopting the "severe, pervasive, and objectively offensive" standard in the context of Title IX that had been previously established in the context of Title VII in *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). Thus, "[b]roadly speaking, a hostile environment claim requires the victim to have been subjected to harassment severe enough to compromise the victim's employment . . . opportunities and, in the case of a Title IX claim (but not under Title VII), the institution must have had actual knowledge of the harassment and have exhibited deliberate indifference to it." *Wills v. Brown Univ.*, 184 F.3d 20, 26 (1st Cir. 1999).

**Plaintiffs' Title IX Claims**

Plaintiffs claim that the Institute violated Title IX[1] in two ways: (1) by responding to the "assault and battery" perpetrated against Ms. Montoya by Mr. Garcia in a manner

---

[1] The Court notes that the parties spend a significant amount of briefing on the issue whether Title IX covers the type of conduct (employee-on-employee sexual

that was "clearly unreasonable"; and (2) by effectively creating for Ms. Montoya a hostile work environment "by placing [her] in constant uncertainty and exposure to possible encounters with her assailant." [Doc. 1-1 ¶¶ 81-98] While the *Complaint* couches these alleged violations as distinct claims, they actually comprise elements of a single Title IX claim. In the parlance of Title IX law, Ms. Montoya's allegation that the Institute's response was clearly unreasonable constitutes an allegation of deliberate indifference; and her hostile work environment claim pertains to the severity of the attack and its effect on Ms. Montoya's access to the opportunities provided by the Institute. *See Rost*, 511 F.3d at 1119 (stating the elements of a Title IX claim); *Wills*, 184 F.3d at 25 (explaining that the "hostile environment" theory of sexual harassment "applies where the acts of sexual harassment are sufficiently severe to interfere with the workplace or school opportunities normally available to the worker or student"). With this in mind, the Court considers whether the allegations in the *Complaint* are sufficient to state a Title IX claim.

1. **Actual Knowledge**

---

harassment) alleged here. [Doc. 6 p. 5-11; Doc. 15 p. 6-29; Doc. 23 p. 1-4] This question has yet to be addressed directly by our Tenth Circuit. As noted in a recent case from the district of Kansas, although our "Tenth Circuit has not addressed whether Title IX applies to allegations of sexual harassment perpetrated by one university employee on another university employee . . . the balance of authority in other circuits and jurisdictions recognize Title IX liability for employee-on-employee sex discrimination and harassment." *Fox v. Pittsburg State Univ.*, No. 14-CV-2606-JAR-KGG, 2016 WL 6037558, at *2 (D. Kan. Oct. 14, 2016); *see N. Haven v. Bd. of Educ. v. Bell*, 456 U.S. 512, 520 (1982) (holding that Title IX's prohibition of sex discrimination applies to "[e]mployees who directly participate in federal programs or who directly benefit from federal grants, loans, or contracts"). The Court leaves the resolution of this issue for another day. For the purposes of resolving Defendants' *Motion to Dismiss*, the Court assumes, but does not decide, that Title IX provides a cause of action for employee-on-employee sex discrimination and harassment.

To satisfy the "actual knowledge" element of a Title IX claim, a plaintiff must show that "an appropriate person . . . had actual knowledge of discrimination" in the funding recipient's (here the Institute's) program. *Escue*, 450 F.3d at 1153. Ms. Montoya reported the attack perpetrated upon her by Mr. Garcia to four of the Institute's officials— EMRTC Assistant Facility Security Officer, David Urban; the Institute's Assistant Police Chief, Scott Scarborough; Director of Finance and Human Resources for EMRTC, Mona Torres; and the Institute's Director of Human Resources, Jo Ann Salome. [Doc. 1-1 ¶¶ 41, 45, 48-49, 51] The latter two individuals had the authority to take disciplinary action against Mr. Garcia. [Doc. 1-1 ¶¶ 47, 52] These facts are adequate to satisfy the "actual notice" requirement of a Title IX claim. *See Rost*, 511 F.3d at 1117, 1120-21 (holding that the actual notice requirement was satisfied by the victim's disclosure of sexual harassment to a high school counselor); *Escue*, 450 F.3d at 1150, 1153 (holding that the president of the university was an "appropriate person" to receive actual knowledge of sexual harassment).

### 2. Deliberate Indifference

A funding recipient may only be considered "deliberately indifferent" "where [its] response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. The school's "deliberate indifference must, at a minimum, cause [the plaintiff] to undergo harassment or make [her] liable or vulnerable to it." *Id.* at 644-45. At the same time, school administrators enjoy flexibility and independence in deciding appropriate disciplinary actions. *Id.* at 648. Courts are not permitted to second guess the disciplinary decisions made by school administrators. *Id.*

at 648. And victims of harassment have no right to make "particular remedial demands." *Id.*

Deliberate indifference, which is evidenced by a clearly unreasonable response to harassment, does not evoke "a mere 'reasonableness' standard[.]" *Id.* at 649. In appropriate circumstances, a court may identify a response as not clearly unreasonable as a matter of law, as grounds for dismissing the claim. *Id.*

The following cases place these principles in context. In *Davis*, the allegations in the plaintiff's complaint were sufficient to show deliberate indifference where a fifth grade student and some of her female classmates were repeatedly sexually harassed by another student. *Id.* at 633-35, 653. Although the victim told school officials about the harassment each time it happened (at least six distinct incidents over the course of several months), the school never disciplined the perpetrator of the harassment. *Id.* at 633-35. The harassment finally ended only when the perpetrator was charged with, and pleaded guilty to, sexual battery for his misconduct. *Id.* at 634.

The deliberate indifference standard was also satisfied in *Murrell v. Sch. Dist. No. 1*, 186 F.3d 1238, 1248 (10th Cir. 1999). There, a female special education student's disabilities rendered her legally unable to consent to sex and, as the student's mother expressly advised the school, those disabilities rendered her particularly at risk of sexual assault. *Id.* at 1243. At the beginning of a particular month, the student's teachers learned that a male student was engaged in aggressive, sexually inappropriate conduct toward the special education student during school hours. *Id.* Within the same month, the male student took the female student to a secluded area of the school and sexually

10

assaulted her—a fact that the teachers knew, but hid from the special education student's mother. *Id.* at 1243-44.  Thereafter, the male student sexually assaulted and battered the special education student on several occasions, and although teachers knew about at least two of the incidents, they did not discipline the perpetrator or advise the female student's mother of the sexual assaults. *Id.*  When the special education student's mother finally learned of the sexual assaults, she contacted the principal of the school who declined to investigate the matter, and suspended the special education student, but took no disciplinary action against the perpetrator. *Id.* at 1244.  The *Murrell* Court determined that the principal's and the teachers' responses to the known acts of harassment amounted to deliberate indifference under the circumstances. *Id.* at 1248

On the other end of the spectrum, in *Escue*, a university's response to allegations of professor-on-student sexual harassment was held to be *not* clearly unreasonable. *Escue*, 450 F.3d at 1156.  In that case, once it learned of the harassment (which consisted of inappropriate sexual comments, fondling, and peering down the student's pants), the university removed the student from the offending professor's class, investigated the allegations by talking to the student's peers and to the professor, and declined to extend its relationship with the professor beyond the end of the semester. *Id.* at 1150, 1155.  Significant to the Court's conclusion in favor of the university was the fact that the student did "not allege that any further sexual harassment occurred as a result of [the university's] deliberate indifference. *Id.* at 1155 (citing *Davis*, 526 U.S. at 644-45, for the proposition that "the deliberate indifference must, at a minimum, cause students to undergo harassment or make them more vulnerable to it").

11

As a final example, in *Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 388-89 (5th Cir. 2000), the Fifth Circuit affirmed summary judgment in favor of a school district on the ground that the plaintiff had not demonstrated deliberate indifference.  There, in response to a student's allegation that he had been fondled sexually by a teacher when delivering a note to the teacher's classroom, the school spoke with the student and the teacher, assured the student's mother that the student would not be sent to that teacher's classroom again, and admonished the teacher not to repeat the behavior that led to the fondling allegation.  *Id.* at 387-88.  Although these measures ultimately proved ineffective in preventing the teacher from later sexually abusing other students, the *Doe* Court determined that, as a matter of law, the school district had not exhibited deliberate indifference to the fondling allegation.  *Id.* at 388-89.

Turning to the circumstances here, Ms. Montoya argues that the Institute's deliberate indifference is evidenced by its response to her report of the incident which, in Ms. Montoya's view, was "clearly unreasonable in light of the known circumstances." [Doc. 15 p. 32]  As noted in the *Complaint*, once Ms. Montoya reported the attack, to Mr. Urban, a security officer, he scheduled a meeting with her the following day. [Doc. 1-1 ¶ 45]   At the meeting, Mr. Urban advised her to report the incident to Ms. Torres, the director of finance and human resources for EMRTC. [Doc. 1-1 ¶ 45] Mr. Urban immediately reported the incident to Mr. Scarborough, the Institute's Assistant Police Chief; and Ms. Montoya met with Ms. Torres who, in turn, advised her to meet with Ms. Salome, the director of human resources for the Institute.  [Doc. 1-1 ¶¶ 45-48]  Mr. Scarborough contacted Ms. Montoya, and met with her the following day to take her

report.  [Doc. 1-1 ¶ 51]  A little over a week later, Ms. Montoya met with Ms. Salome who advised her that Mr. Garcia had been placed on leave for approximately one week, and that she had told Mr. Garcia "not to go near" Ms. Montoya.  [Doc. 1-1 ¶ 51]  The *Complaint* does not allege any further instances of sexual harassment.

As a matter of law, the Institute's response was not clearly unreasonable in light of the known circumstances.  *See Davis*, 526 U.S. at 649 (stating the deliberate indifference standard).  Upon hearing Ms. Montoya's account of the events, Mr. Urban and Ms. Torres immediately took steps to assist Ms. Montoya by bringing the allegations to the attention of their superiors, Mr. Scarborough and Ms. Salome.  Mr. Scarborough and Ms. Salome, in turn met with Ms. Montoya.  As a result of these measures, Mr. Garcia was disciplined by being placed on leave, and admonished not to go near Ms. Montoya.  Unlike the schools in *Davis* and *Murrell*, the Institute did not ignore, attempt to hide, or fail to remedy, repeated acts of harassment.  Like the schools in *Escue* and *Doe*, the Institute took steps to investigate the matter (by interviewing Ms. Montoya and taking her statements), and acted in a manner reasonably intended to avoid future contact between the harasser and his victim.  Finally, and perhaps most significantly, the Institute's response did not lead to further incidents of harassment.  *See Escue*, 450 F.3d at 1155 (stating that the absence of further instances of harassment is significant in a deliberate indifference analysis).

Ms. Montoya argues that the Institute could have but failed to take additional investigatory measures—such as interviewing other witnesses or conducting an "adjudicative process."  [Doc. 15 p. 32]  And she argues that the Institute could have but

13

failed to impose harsher discipline—including particularly terminating Mr. Garcia's employment and/or banning him from campus. [Doc. 15 p. 32] While the Institute could have undertaken a more elaborate investigation, and that it could have taken more extreme disciplinary measures against Mr. Garcia, this is not a case in which the school took no action to remedy a known instance of sexual harassment. Because the Institute responded to the sexual harassment in a manner that was not clearly unreasonable, neither the Court nor Ms. Montoya is entitled to dictate the Institute's response to Mr. Garcia's act of sexual harassment. *Davis*, 526 U.S.at 648 (stating that school administrators enjoy flexibility and independence in deciding appropriate disciplinary actions; and courts are not permitted to second guess the disciplinary decisions made by school administrators, nor are victims of harassment entitled to make particular remedial demands).

### 3. Severity, Pervasiveness, and Objective Offensiveness of the Harassment

The notion of a sexually hostile environment in the Title IX context mirrors that of Title VII. *See Davis*, 526 U.S. at 636 ("[A]s Title VII encompasses a claim for damages due to a sexually hostile working environment created by co-workers and tolerated by the employer, Title IX encompasses a claim for damages due to a sexually hostile education environment[.]"). A Title IX action is sustainable only if the plaintiff demonstrates "harassment that is so severe, pervasive, and objectively offensive that it effectively bars the victim's access" to the opportunities provided by the school. *Davis*, 526 U.S. at 633. Generally, a single instance of harassment does not satisfy this requirement of Title IX. *See Davis*, 526 U.S. at 652-53 (expressing doubt that Congress contemplated Title IX claims arising from a single instance of sexual harassment; and concluding, instead, that

the purpose of Title IX liability was to "limit[] private damages actions to cases having a systematic effect on education programs or activities"). However, in exceptional circumstances, such as in the case of a severe, violent, forcible rape, a single instance of harassment may be so egregious, and the school's response so inadequate, as to create a sexually hostile environment under Title IX. *See Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 172-73 (1st Cir. 2007) (stating that, in theory, a single instance of sexual harassment can be so vile, and the school's response so inadequate, as to satisfy this requirement), *rev'd on other grounds*, 555 U.S. 246 (2009); *S.S. v. Alexander*, 177 P.3d 724, 742-43 (Wash. Ct. App. 2008) (discussing a severe, violent, forcible rape, and holding that "[i]n the Title IX context, there is no 'one free rape' rule"; and a student "did not have to be raped twice before the university was required to appropriately respond to her requests for remediation and assistance").

Here, the allegations in the *Complaint* do not satisfy this standard. The *Complaint* describes a single episode of sexual harassment. The incident of sexual harassment, which lasted fewer than fifteen minutes, involved Mr. Garcia forcibly fondling Ms. Montoya, making degrading advances and comments, and removing some of his own clothing. The incident of harassment that Ms. Montoya suffered at the hands of Mr. Garcia was objectively bad and offensive. However, in light of the Supreme Court's holding that Title IX claims should not proceed upon an isolated instance of harassment, the absence of a reasonable comparison between the instance of harassment here and the extreme circumstance of a forcible violent rape that has been held to constitute an exception to that general rule, and the Institute's reasonable response, the *Complaint* does

not satisfy the hostile environment element of a Title IX claim.  *See Watkins v. La Marque Indep. Sch. Dist.*, 308 Fed.Appx. 781, 784 (5th Cir. 2009) (holding that a single instance of sexual harassment during which one student lifted another student's skirt, exposed himself to her, and kissed her did not satisfy the severe, pervasive, and objectively offensive element of Title IX); *c.f. Hansen v. SkyWest Airlines*, 844 F.3d 914, 923 (10th Cir. 2016).  ("A hostile work environment claim is composed of a series of separate acts that collectively constitute one unlawful employment practice . . . . it takes place over time, and in direct contrast to discrete acts, a single act of harassment may not be actionable on its own."); *Creamer v. Laidlaw Transit, Inc.*, 86 F.3d 167, 169 (10th Cir. 1996) (holding, in the Title VII employment context, that a single instance of sexual harassment that lasted only a few minutes during which a woman's male coworker kissed her, followed her around the office, and then when they were in another room, grabbed her by the waist or the wrists and pinned her against a pool table was neither "severe" nor "pervasive").

**CONCLUSION**

For the reasons stated herein, the Court concludes that the allegations in the *Complaint* do not satisfy the requisite elements of a Title IX claim.  Accordingly, Counts VI and VII, which comprise Plaintiffs' Title IX claim, are dismissed.

The Court declines to exercise supplemental jurisdiction over Plaintiff's remaining claims arising under New Mexico law.  These claims shall be remanded to the Seventh Judicial District Court, Socorro County, New Mexico.

**WHEREFORE IT IS HEREBY ORDERED THAT**:

1)  Counts VI and VII of the *Complaint* [Doc. 1-1] are **DISMISSED**; and

2)  The Court declines to exercise supplemental jurisdiction over Plaintiff's remaining claims arising under New Mexico which are remanded to the Seventh Judicial District Court, Socorro County, New Mexico.

**SO ORDERED** this 21st day of March, 2017.

_____
M. CHRISTINA ARMIJO
Chief United States District Judge